HOUSTON CHRONICLE PUB. CO. v. McDAVID. (No. 5412.)

(Court of Civil Appeals of Texas. Austin. Dec. 9, 1914. Rehearing Denied Feb. 3, 1915.)

1. LIMITATION OF ACTIONS ☞127—AMENDMENT OF PLEADINGS—ACTION OF TORT.

In an action of tort for an injury, such as a libel, where the place and circumstances are stated in the original petition, which is filed before limitation has barred the action, limitation cannot successfully be urged to an amendment stating more specifically the results of the injury, filed when the statute would bar a recovery on a suit then brought.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 543–547; Dec. Dig. ☞127.]

2. LIBEL AND SLANDER ⟺120—EXEMPLARY DAMAGES—MALICE.

To recover exemplary damages in an action for libel, it is necessary to prove actual or express malice.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 350, 351; Dec. Dig. ⟺ 120.]

3. LIBEL AND SLANDER ⟺112—EVIDENCE—MALICE—"WILLFUL OR WANTON WRONG"—"GROSS INDIFFERENCE."

Evidence in a libel suit founded upon the publication of an answer filed in a divorce suit *held* not to show "gross indifference," or "willful or wanton wrong," which, as used in the definition of "malice," means an act done with the specific intention to injure the person injured, or an act done with such utter recklessness as to indicate a disregard of consequences, so as to support a verdict for exemplary damages.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 325–341; Dec. Dig. ⟺ 112.]

4. TRIAL ⟺115—CONDUCT OF ATTORNEY—REFERENCE TO FORMER TRIAL AND VERDICT.

In the trial of a libel suit it was improper for plaintiff's attorney to state in his argument to the jury that the case had been tried before and a verdict returned for plaintiff.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 279–283, 295, 298; Dec. Dig. ⟺115.]

5. LIBEL AND SLANDER ⟺51—PRIVILEGE—MALICE.

A publication is not privileged where actual malice is shown.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 149; Dec. Dig. ⟺51.]

6. LIBEL AND SLANDER ⟺38—PRIVILEGE—PLEADINGS—"JUDICIAL PROCEEDING"—"OFFICIAL PROCEEDING"—"PROCEEDING"—STATUTE.

Rev. St. 1911, art. 5597, declaring a fair, true, and impartial account of proceedings in a court of justice, unless the court prohibits its publication, or any other official proceeding authorized by law in the administration of the law, privileged, does not justify the publication of a libelous written pleading, properly filed, upon which no action by the court, judge, or any other officer has been taken in reference to the matter referred to therein; but the privilege is limited to proceedings while the court is in session and may have an opportunity to prohibit publication. The filing of a pleading by the clerk is merely a ministerial act not constituting a "proceeding." While a pleading, and especially one asking for some relief, may be designated as part of a judicial proceeding, it does not constitute an official proceeding; the distinction being that a "judicial proceeding," as applied to pleadings, refers to something done by the parties to the suit, while an "official proceeding" denotes action taken by an officer.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 117–123; Dec. Dig. ⟺ 38.

For other definitions, see Words and Phrases, First and Second Series, Judicial Proceeding; Proceeding.]

Appeal from District Court, Bastrop County; Ed. R. Sinks, Judge.

Action by Dock McDavid against the Houston Chronicle Publishing Company. Judgment for plaintiff, and defendant appeals. Reversed and remanded.

Hunt, Myer & Teagle, of Houston, and Page & Jones, of Bastrop, for appellant. Sam Schwartz, of Houston, and Orgain & Maynard, of Bastrop, for appellee.

KEY, C. J. This is the third appeal in this case. At the first trial the court below sustained a general demurrer to the plaintiff's petition, from which ruling the plaintiff appealed, and this court held that the petition stated a cause of action, and reversed the case. McDavid v. Houston Chronicle Printing Co., 146 S. W. 252. The case went back and was tried upon its merits, and a verdict and judgment rendered for the plaintiff, from which the defendant appealed, and this court reversed the judgment on account of the improper admission of certain testimony. Houston Chronicle Publishing Co. v. McDavid, 157 S. W. 224. Thereafter the case was tried again, and verdict and judgment rendered for the plaintiff for $4,000 actual and $1,000 exemplary damages, and the defendant has prosecuted its second appeal.

[1] The case is a libel suit, founded upon the publication of an answer filed in a divorce suit, and is more fully explained in our former opinions, in the first of which the alleged libelous publication is set out in full. On the last appeal, the case was reversed because the trial court permitted the plaintiff to introduce testimony tending to show that shortly after the publication referred to the plaintiff's wife sustained a mental and physical breakdown. This court held that there was no pleading to support the testimony referred to, and when the case went back the plaintiff amended his petition, and alleged that as a result of the publication of the alleged libel the health of plaintiff's wife was seriously impaired, and her mind was injured and she became insane. That plea was filed more than two years after the making of the publication, and appellant interposed the statute of limitations as a defense. The trial court overruled that plea, and that ruling is assigned as error, and we overrule that assignment. It seems to be well settled by decisions of our Supreme Court that when the cause of action is an injury resulting from a tort committed by the defendant, the time, place, and circumstances of which are stated in the original petition, which is filed before limitation has barred the action, limitation cannot successfully be urged to an amendment which states more fully and specifically than the original petition the results of the injury, though the latter be filed at a time when the statute would bar a recovery on a suit then brought. Railway Co. v. Irvine, 64 Tex. 529; Railway Co. v. Davidson, 68 Tex. 370, 4 S. W. 636; Cotter v. Parks, 80 Tex. 539, 16 S. W. 307. The case at bar is based upon an alleged tort, the time, place, and circumstances of which are stated in the original petition, and the amendment

merely states more fully and specifically the results of the injury, and therefore the case falls within the rule announced in the cases just cited.

[2, 3] Most of the other questions presented in appellant's brief were decided by this court on the former appeals; and, except as will hereinafter appear, we adhere to the rulings then made. On this appeal we have given the entire case a careful reconsideration, and have reached the conclusion that it should be reversed, because the testimony does not support the verdict for exemplary damages. In order to recover such damages, it was necessary for the proof to show actual or express malice. The undisputed testimony clearly shows that the agent of appellant who caused the publication to be made was not acquainted with appellee or his wife, nor with either of the parties to the divorce suit, and had no ill will against either of them. But it is contended on behalf of appellee that the testimony shows such gross indifference to the rights of others on the part of appellant as amounts to a willful or wanton act, and if it does it will support the finding of actual malice; but we have been unable to find any such testimony in the record. The proof shows that the copy or transcript from which the publication was made was submitted by a reporter of the Chronicle to Mr. Gillespie, the managing editor. It seems that the document submitted had the names of the parties to the divorce suit and the specific court in which that suit was pending, and Mr. Gillespie, to use his language, "edited them out of it." In support of their contention that evidence was submitted justifying a finding of actual or express malice, counsel for appellee make the following statement in their brief:

"Plaintiff also offered in evidence on this issue the answers of the witness C. B. Gillespie to cross-interrogatories propounded to him. This witness testified: 'I do not remember the publication of any other part of the pleadings in the suit of Fisher v. Fisher.' The following question was propounded to the witness: 'If, in answer to direct interrogatories propounded to you, you reply to the effect and in substance that, prior to the publication of the matter complained of, you did not know Dock McDavid and wife, or their residence, and that you have had no business dealings with them, or either of them, and that you did not know that they were the parents of Mrs. Allison, formerly Mrs. Fisher, then please state what efforts, if any, you made to acquaint yourself with such matters?' His answer was: 'I made no efforts, as no names were used in the article. Whether I took into consideration, prior to the publication of the matter complained of, the fact that the matter so published might reflect discredit, shame, and humiliation upon the parties to whom it referred, and that upon the reading thereof it might wound their feelings, and cause them, or any of them, mental distress and anguish, * * * I did not consider the article as one identifying any of the parties. Whether I knew, upon reading the matter complained of, that the paragraph following the words "An Inherited Disposition" referred to the parents of Mrs. Fisher, I did not give special consideration · or thought to any particular portion of the article, as I considered a story without names entirely general.'

"During the course of cross-examination of the witness C. B. Gillespie, it was agreed that in the original answer filed by the defendant in the divorce suit by the defendant in the case of Fisher v. Fisher, in which the plaintiff was the daughter of Dock McDavid, the words 'her mother' were not in there, and that there was no reference to the mother whatever in this answer purporting to be published by the newspaper. The witness C. B. Gillespie, on cross-examination, testified as follows: 'I said awhile ago that I left the names out as a matter of safety. I mean by that, * * * well, safety to the publishers. It would have been privileged under the law to publish it with the names. Whether that is a matter of opinion, * * * you asked me that, didn't you? As to what I mean by "safety" in leaving out the names, whether I wanted to protect myself against a possible suit for damages, I cut the names out so that it would not refer to anybody in the world. It might as well have been somebody in South America, Asia, or Africa. I said I cut the names out as a matter of safety to the publishers. As to what I feared might happen to the publishers if the names were connected with the article, * * * a number of things might occur. Ordinary items in the paper, people come to us and telephone us. * * * It requires space given them. People come in and say: "Well, you published this; now you must publish our side of it." It takes up columns and columns of space. We do that cheerfully, because we do not want to put anybody in the wrong light. We want to treat everybody exactly alike, but by the elimination of the names absolutely I thought it would place the matter beyond anybody ever coming to see if there would be something more about it. That is what I mean. Whether I thought only a question of safety was involved, * * * always a question of safety in connection with liability. I did not say that I left out the names in order to avoid a possible suit, for publishing it, for damages. I say there is always a question of liability. We are always looking out for lawsuits. Whether I realized that at the time, * * * I realized that all the time; yes, sir. Whether under ordinary circumstances, just publishing matters I am privileged to publish, which I am entitled to publish, that I do not have any fears as that. * * * I never passed on an item in my life without applying the golden rule where I feared a right. Yes; I applied the golden rule to this article. I did. I treated those people like I wanted to be, if I was in their condition. I knew the names referred to by the reporter were in there. I did not know the parties personally. I had no ill will against them in the world. I had no antagonism against them. I had no interest in publishing anything that might injure them. Whether I made any investigation to determine the standing of the plaintiff in this suit, and that of his wife, * * * I did not name the plaintiff in this suit, or his wife. There was no necessity for that. I knew the article referred to the mother of the plaintiff. I could not tell from the article anybody's name. The article published did not refer to any plaintiff, or defendant, or anybody. I did not ascertain who that mother was, and her standing, because we took the names out of it. No; I did not know that anybody would know, from the reading of that article, that it referred to the mother, and that they would know who that mother was, or afterwards find out and ascertain by investigation, and that it might injure them. I did not know that. I did not know that it would injure anybody. As to why I · wanted to be safe about it, * * * because there might be a difference of opinion between them and me about that, as to that. Whether I made an in-

vestigation to determine who the mother was, * * * I cut the names out. I made no investigation to find who the mother was. I never did; no, sir. At the time I published that article, I took into consideration the fact that the article as it was published might humiliate and shame the parties to whom it actually did refer, and injure them in their good name and reputation. I always take that into consideration—those facts. Whether at this time I took it into consideration, * * * I do not think that I went into the article any more than to revise it, and make it refer to nobody. I do not remember that point. I really do not. Yes; I know as a matter of fact that the records of the courts are open to all parties. I know that. I believe anybody who wishes to do so can go to the courts, notwithstanding no names are mentioned, and find the actual answer, together with the names of the parties to the suit. I believe that would have been the case, whether there was any publication or not. Anybody can go to the courts. If anybody was interested to find out who the parties were after seeing the publication, I think that they could go to the courts and ascertain anything on file at that time. I knew that at the time, undoubtedly. Everybody knows that.' Again: 'Whether, in my capacity as editor, I published any other of the proceedings, the pleadings in the divorce suit of Fisher v. Fisher, * * * my recollection. is that we did not publish anything in connection with the divorce suit of Fisher v. Fisher. We published the answer in the divorce suit, but it was not; * * * it had nothing to say about Fisher v. Fisher; nothing to say about them whatsoever. I knew when we published it and had knowledge that it was in that particular suit.' Again: 'Ordinarily, and usually, all court news is published under the head "Court Routine." Ordinarily under that head we haye two or three paragraphs in regard to particular suits, which we regard as unusual, calling attention to the nature of the suit. These are called "leads," explaining the nature of the suit, especially if the matter is of unusual interest. Whether it is a very rare thing for us to publish the pleadings, * * * we went over that awhile ago, that particular question, I think.' "

That statement is as strong in appellee's favor as the record will justify; and, in our opinion, while it might perhaps support a finding of slight negligence, it falls short of showing gross negligence or gross indifference to the rights of others. On the contrary, the proof shows that the managing editor, before authorizing the publication, attempted to make such changes in it as would prevent identification of any persons therein referred to. This effort, although it may not have been successful, shows clearly that the managing editor was not guilty of gross indifference or willful or wanton wrong. Nor is it any answer to this to say that in exercising the care referred to Mr. Gillespie was merely attempting to avoid a libel suit. A willful or wanton act or gross indifference, as used in the definition of malice, means an act done with the specific intention to injure the person that was injured, or an act done with such utter recklessness as to indicate a disregard of consequences. The act here complained of was done in due course of business. That business was the publication of a daily newspaper; and, no doubt, the duties of the managing editor of such a publication are not only arduous, but the very nature of the business requires them, in many instances, to be performed with great celerity. By a given hour the editorial department must furnish sufficient copy to fill a designated amount of space in each issue of the paper; and therefore it is no doubt true that, on many occasions, that department, and especially the managing editor, is compelled to work in haste. But, notwithstanding these facts, as stated before, the testimony shows that in this case the managing editor made an effort to have the publication in question couched in such language as would prevent identification of the persons therein referred to; and the effort so made, though it may not have been successful, negatives the charge of gross negligence or indifference. Nor was such wrongful conduct shown by the fact that the editor made no effort to ascertain more than he then knew concerning Mrs. Fisher, the plaintiff in the divorce suit, or Mr. and Mrs. McDavid, her father and mother. The proof that he did not know them, and had never had any ·dealings with them, was pertinent for the purpose of negativing the existence of. ill will; and the fact that, if he had waited and attempted to do so, he might have ascertained more about them, does not prove gross indifference or a willful purpose to injure them. .

So, our conclusion is that the assignments of error which present the contention that the testimony does not support a finding of actual or express malice must be sustained. Upon another trial, if no further and stronger testimony is submitted upon that issue, we hold that the trial court should instruct a verdict for the defendant upon the issue of punitory damages.

[4] We also hold that it was improper for appellee's attorney to state in his argument to the jury that the case had been tried before and a verdict returned for appellee. It is not necessary to decide whether that error alone would justify a reversal of the ·case, and we content ourselves with saying by way of admonition that it would be the part of wisdom not to take any such risk upon another trial.

[5, 6] As the case is to be sent back for another trial, we deem it proper to say that the opinion of this court upon an important question in it has undergone a change. Heretofore we have held that the publication was privileged, unless actual malice was shown; and at the trial now under review the trial court, in pursuance. of our former decision, instructed the jury that the publication was privileged, and that the plaintiff could not recover either actual or punitory damages unless actual malice. was shown. Further consideration of that question leads this court to conclude that our former decision was wrong, and that the publication in question was not privileged, and that decision may be considered as over-

ruled. Our statute upon the subject of libel deals with newspaper privilege (article 5597, R. S.) in the following language:

"The publication of the following matters by any newspaper or periodical, as defined in article 5595, shall be deemed privileged, and shall not be made the basis of any action for libel without proof of actual malice:

"1.—A fair, true and impartial account of the proceedings in a court of justice, unless the court prohibits the publication of the same, when in the judgment of the court the ends of justice demand that the same should not be published, and the court so orders; or any other official proceedings authorized by law in the administration of the law.

"2.—A fair, true and impartial account of all executive and legislative proceedings that are made a matter of record, including reports of legislative committees, and of any debate in the Legislature and in its committees.

"3.—A fair, true and impartial account of public meetings, organized and conducted for public purposes only.

"4.—A reasonable and fair comment or criticism of the official acts of public officials and of other matters of public concern published for general information."

It is the first subdivision of that statute which has application to the publication of court proceedings, and we are of opinion that it should not be so construed as to justify the publication of any written pleading properly filed, however libelous it may be, when no action by the court, the judge, or any other officer has been taken in reference to the matter referred to in the pleading. That statute authorizes the publication of a fair, true, and impartial account of the proceedings in a court of justice, unless prohibited by the court. And it also authorizes such publication of any other official proceedings authorized by law in the administration of the law. It seems manifest from its language that the first part of it is limited to proceedings in court—proceedings that occur while the court is in session. It uses the language "proceedings in a court of justice," and it says that a fair, true, and impartial account of such proceedings may be published, unless the *court* prohibits the publication of the same. This implies, and necessarily means, that the matter about which the publication may be made is one which the court has had an opportunity to prohibit. It is a well-known fact that pleadings are very often filed in vacation, when it would be impossible for the court to make any order in reference thereto; and if such pleadings, though intensely libelous, could be lawfully published as soon as filed, that portion of the statute which gives to the court power to prohibit publications would be rendered nugatory.

The last part of that subdivision of the statute extends the privilege to the publication of a fair, true, and impartial account of any other *official* proceedings authorized by law in the administration of the law; but we do not think that paragraph should be so construed as to authorize the publication of the contents of pleadings, when no action

has been taken thereon by any officer. In the case at bar it is true that the answer in the divorce suit, which was the subject-matter of the publication, had been filed by the clerk; but such filing was a mere ministerial act upon his part, and did not constitute a proceeding within the purview of the statute. There are many official acts performed when the court is not in session, and to which this portion of the statute would apply, such as the appointment of a receiver, the issuance of a writ of injunction, or a warrant of arrest, and many others which might be specified. But preparing a written pleading by the party or his attorney, and delivering the same to the clerk to be filed, is not an official proceeding, and the file mark of the clerk does not render it such. If it be conceded that the act of the clerk in filing the paper is an official act, then the only privilege that would result therefrom would be the right to publish the fact that the pleading, giving its name as petition or answer, had been filed, without the right to publish the contents thereof. As a matter of fact, although our libel statute was amended in 1901, the article covering the subject of newspaper privilege adds very little, if anything, to the common law upon that subject, which is admirably and concisely stated in 25 Cyc. p. 406, as follows:

"In General.—A full, fair, and impartial report of a judicial proceeding is qualifiedly privileged, unless the court has itself prohibited the publication, or the subject-matter of the trial or proceeding be unfit for publication. And no action will lie therefor, except on proof of malice in making it. This privilege has been extended to writers of law books referring to reported cases faithfully and fairly, although failure to use reasonable care and diligence in order to be correct destroys the privilege. * * *

"A distinction has been drawn between reports of what takes place in open court and that which is done out of court by one party alone, and it is held that the publication of the contents of a petition or of other pleadings or papers filed in civil proceedings before trials, or before any action has taken place on such pleadings or papers by the court, is not privileged. But the privilege covers proceedings which are in their nature only preliminary, if any judicial action has been had thereon. * * *

"The general rule seems to be that the publication of ex parte criminal proceedings before a public magistrate is privileged."

Perhaps the leading American case upon that subject is Cowley v. Pulsifer, 137 Mass. 392, 50 Am. Rep. 318, and it was there held that the publication of a petition, though duly filed in court, was not privileged. The court pointed out the distinction in reference to privilege between the rights of a litigant and the rights of a third person to publish what the litigant had stated in his pleading, and also the difference between a pleading filed by one of the parties and the trial of cases or other official acts in reference thereto, and among other things it was said:

"The privilege set up by the defendants is not that which attaches to judicial proceedings, but that which attaches to fair reports of judicial proceedings. Now, what is the reason for

this latter? The accepted statement is that of Mr. Justice Lawrence in Rex v. Wright, 8 T. R. 293, 298: 'Though the publication of such proceedings may be to the disadvantage of the particular individual concerned, yet it is of vast importance to the public that the proceedings of courts of justice should be universally known. The general advantage to the country in having these proceedings made public more than counterbalances the inconveniences to the private persons whose conduct may be the subject of such proceedings.' See, also, Davison v. Duncan, 7 El. & Bl. 229, 231; Wason v. Walter, L. R. 4 Q. B. 73, 88; Commonwealth v. Blanding, 3 Pick. (Mass.) 304 [15 Am. Dec. 214].

"The chief advantage to the country which we can discern, and that which we understand to be intended by the foregoing passage, is the security which publicity gives for the proper administration of justice. It used to be said sometimes that the privilege was founded on the fact of the court being open to the public. Patterson, J., in Stockdale v. Hansard, 9 A. & E. 1, 212. This, no doubt, is too narrow, as suggested by Lord Chief Justice Cockburn in Wason v. Walter, ubi supra; but the privilege and the access of the public to the courts stand in reason upon common ground. Lewis v. Levy, El. Bl. & El. 537, 538. It is desirable that the trial of causes should take place under the public eye, not because the controversies of one citizen with another are of public concern, but because it is of the highest moment that those who administer justice should always act under the sense of public responsibility, and that every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed.

"If these are not the only grounds upon which fair reports of judicial proceedings are privileged, all will agree that they are not the least important ones. And it is clear that they have no application whatever to the contents of a preliminary written statement of a claim or charge. These do not constitute a proceeding in open court. Knowledge of them throws no light upon the administration of justice. Both form and contents depend wholly on the will of a private individual, who may not be even an officer of the court. It would be carrying privilege farther than we feel prepared to carry it to say that, by the easy means of entitling and filing it in a cause, a sufficient foundation may be laid for scattering any libel broadcast with impunity."

We note the fact that in the case just cited the court speaks of the pleading there under consideration as a judicial proceeding, and in a certain sense pleadings may be thus designated; but our statute does not authorize the publication of every paper which may constitute part of a judicial proceeding, but only authorizes an impartial account of proceedings or things which have been done in open court, or such an account of other *official* proceedings. While a pleading, and especially one which asks for some relief, may be designated as part of a judicial proceeding, such pleading does not constitute an official proceeding. There is a marked distinction between the term "judicial proceeding," as applied to pleadings, and the term "official proceeding." The former has reference to something done by the parties to the suit, while the latter denotes action taken by an officer.

Hence we conclude that the publication in question was not privileged, and that the plaintiff will be entitled, without making proof of malice, upon proof of the other necessary facts, to recover actual damages on account of said publication. But in order to recover exemplary damages it was necessary for the plaintiff to prove, as he had alleged, that the defendant was guilty of actual or express malice, and that, we hold, he has failed to do; and for that reason we sustain the assignments of error which complain in that respect, and order a reversal of the judgment.

Reversed and remanded.